*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DR LINDA LEE TARVER and PATRICIA VEGA,

Plaintiffs-Appellants,

v

REPUBLICAN WOMEN'S FEDERATION OF MICHIGAN, DAWN DODGE, ROBYN PEAKE, DAWN CRANDALL, CINDY HOLLAND, CINDY BEACH, and LORRAINE ROOT,

Defendants-Appellees.

UNPUBLISHED
December 29, 2022

No. 358812
Ingham Circuit Court
LC No. 21-000412-CB

Before: PATEL, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

Plaintiffs Dr. Linda Lee Tarver and Patricia Vega are former members of the Republican Women's Federation of Michigan ("RWFM"). Following allegations that Tarver and Vega engaged in misconduct, they were both removed from the organization. Tarver and Vega asserted claims against defendants for defamation, intentional infliction of emotional distress (IIED), and violation of Michigan's Nonprofit Corporation Act (NCA), MCL 450.2101 *et seq.* The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(8), dismissed the complaint in its entirety, and denied Tarver and Vega's request to amend their complaint.

We conclude that the trial court did not err in dismissing Tarver and Vega's claims for IIED and violation of the NCA. But because the defamation claim requires specific pleading, it would be in the interest of justice to provide Tarver and Vega an opportunity to amend their defamation claim. For the reasons stated below, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Because this appeal arises from a dismissal under MCR 2.116(C)(8), the facts are presented as stated in the complaint. RWFM is a volunteer nonprofit organization associated with the National Federation of Republican Women. Tarver formerly served as president of RWFM. In March 2020, Vega became the acting president of the organization because then-president,

-1-

defendant Robyn Peake, became ill. Approximately eight months later, Peake was reinstated as president. In mid-December 2020, RWFM's treasurer, Jane Waligorski, and assistant treasurer, Linda Holloway, resigned from their positions. On December 23, 2020, Peake filed a police report accusing Tarver and Vega of misappropriating RWFM funds.

On December 27, 2020, allegedly at Peake's request, defendant Dawn Crandall sent an e-mail to RWFM's executive committee with an agenda change for a December 29, 2020 meeting:

> We will be voting on whether Linda Lee Tarver and Patricia (Trish) Vega should remain on the RWFM Executive Committee/membership.
> This vote is being taken based on the following:
>
> 1. Misappropriation of funds
>
> 2. Violating RWFM policies, procedures, and practices in regard to expense reimbursement(s)
>
> 3. Violating Article IV, sec V as it pertains to the temporary elevation of Vice Presidents
>
> 4. Failure to transition from the previous administration to the current administration

On December 29, 2020, Holloway, joined by Waligorski, sent an e-mail to defendants stating that Tarver and Vega had not misappropriated any funds.[1] During the December 29, 2020 meeting, Peake spoke in support of Tarver and Vega's removal, but she did not mention the "misappropriation of funds" accusation. Tarver and Vega allegedly were not afforded their full time to speak at the meeting, defendants allegedly did not follow Robert's Rules of Order, and defendants allegedly violated due process and RWFM's bylaws. Six members of the executive committee voted to remove Tarver and Vega, and one member abstained. A few months later, the police investigation concluded that the misappropriation of funds allegations were unfounded.

Thereafter, Tarver and Vega initiated this action against RWFM and five members of the executive committee who voted for their removal. First, they alleged a claim for defamation

---

[1] This e-mail, and accompanying affidavits from Holloway and Waligorski, were submitted with plaintiffs' response to defendants' motion for summary disposition under MCR 2.116(C)(8). Although the email and affidavits were not attached to a pleading, the trial court erroneously considered the email and affidavits in reviewing defendants' motion for summary disposition. See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) ("When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone."). However, any error in considering these materials was not fatal to the trial court's determination that summary disposition was appropriate because the court considered the materials only to determine that Holloway and Waligorski's e-mail was not sent until December 29, 2020, two days after the agenda was sent on December 27, 2020. And the date that the e-mail was sent was pled in the complaint.

resulting from the allegations made to the police, in the December 27, 2020 email, and at the December 29, 2020 meeting. They also asserted a claim for IIED based on the allegedly defamatory statements, defendants' actions at the December 29 meeting, and an allegation that Peake had previously sent either a cookie or toffee in the shape of feces to Tarver's and Vega's homes and "made fun" of the incident during the December 29 meeting. Finally, they asserted a claim for "violation of the RWFM" in connection with defendants' actions at the December 29 meeting. In lieu of filing an answer to the complaint, defendants filed a motion for summary disposition under MCR 2.116(C)(8). Following a hearing, the trial court granted defendants' motion and dismissed the complaint in its entirety. The court also denied Tarver and Vega's request to amend their complaint. This appeal followed.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint." *Id*. (emphasis in original). "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.

Whether a statement is capable of defamatory meaning is a question of law. *Kevorkian v American Med Ass'n*, 237 Mich App 1, 9; 602 NW2d 233 (1999). Similarly, "[w]hether the evidence is sufficient to support a finding of malice constitutes a question of law." *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 677; 635 NW2d 36 (2001). "In considering whether actual malice exists in the context of a motion for summary disposition, the court must consider whether the evidence is sufficient to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id*. "The determination whether a privilege exists is one of law for the court." *Prysak v RL Polk Co*, 193 Mich App 1, 14-15; 483 NW2d 629 (1992).

## III. DEFAMATION

Tarver and Vega argue that the trial court erred by holding that they were required to meet the heightened "actual malice" standard. They also argue that the trial court failed to properly analyze whether a qualified privilege applied to statements in the e-mailed agenda. We disagree, but we conclude that Tarver and Vega should be afforded an opportunity to amend their defamation claim.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (quotation marks and citation omitted). "In Michigan, the four basic elements of a defamation claim are as follows: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Ghanam v Does*, 303 Mich App 522, 544; 845 NW2d 128 (2014) (quotation marks and citations omitted). Because a "statement must

be provable as false" to be actionable, *Mino v Clio Sch Dist*, 255 Mich App 60, 77; 661 NW2d 586 (2003), "[t]ruth is an absolute defense to a defamation claim," *Wilson v Sparrow Health Sys*, 290 Mich App 149, 155; 799 NW2d 224 (2010). "A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 262; 833 NW2d 331 (2013). And we must analyze each "allegedly defamatory statement identified in [the] complaint." *Sarkar v Doe*, 318 Mich App 156, 179; 897 NW2d 207 (2016).

In addition to truth serving as a defense to a defamation claim, a defendant may also assert a privilege defense. As explained in *Postill v Booth Newspapers, Inc*, 118 Mich App 608, 619-620; 325 NW2d 511 (1982):

> In the common law of defamation, a defense of privilege exists. The defense of privilege is a matter of public policy that some communications are so necessary that, even if defamatory, they should be made. Therefore, the publisher is protected from liability by the privilege defense. Privileged communications may be either absolutely privileged or qualifiedly privileged. The difference between absolute and qualified privileges is that the latter affords the publisher protection only in the absence of ill will, spite, or malice in fact.

This case involves both absolute privilege and qualified privilege. First, Peake's statements to the police about what she believed at the time was a misappropriation of the organization's funds cannot be used to support a defamation claim because "reports of crimes or of information about crimes to the police are absolutely privileged." *Eddington v Torrez*, 311 Mich App 198, 201, 202; 874 NW2d 394 (2015).[2]

A qualified privilege applies to "communications on matters of 'shared interest' between parties." *Rosenboom v Vanek,* 182 Mich App 113, 116-117; 451 NW2d 520 (1989). This privilege "extends to all bona fide communications concerning any subject matter in which a party has an interest or a duty owed to a person sharing a corresponding interest or duty," including legal duties, moral obligations, and social obligations. *Id*. at 117. "The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits." *Nuyen v Slater*, 372 Mich 654 (1964) (quotation marks and citations omitted). "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak*, 193 Mich App at 15.

There is a presumption of good faith when a communication is qualifiedly privileged. *Nuyen* 372 Mich at 660. "A plaintiff may overcome a qualified privilege only by showing that the

---

[2] Although the complaint specifically alleged that that Peake's accusations to the police were "false and defamatory" and "considered defamation per se," Tarver and Vega clearly and unequivocally stated in their brief in response to defendants' motion for summary disposition that Peake's statements to the police were not part of their defamation claim.

statement was made with *actual malice*, i.e., with knowledge of its falsity or reckless disregard of the truth." *Prysak*, 193 Mich App at 15 (emphasis added).

> Reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice. "Reckless disregard" is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published. [*Grebner v Runyon*, 132 Mich App 327, 333; 347 NW2d 741 (1984) (citations omitted).]

Actual malice must be established by clear and convincing evidence. *Ireland v Edwards*, 230 Mich App 607, 615; 584 NW2d 632 (1998). "General allegations of malice are insufficient to establish a genuine issue of material fact." *Prysak*, 193 Mich App at 15.

Tarver and Vega maintain that defamatory statements were published to individuals other than those who were "proper parties" with an interest in the allegations and thus the shared-interest qualified privilege is not applicable. The complaint alleges that the December 27 e-mail "was sent to numerous individuals, including but not limited to county state presidents of RWFM and members of the executive committee." This allegation does not identify any person outside of the organization that the e-mail was sent to. The executive committee and members of RWFM have a shared interest in the board's reasons why it sought to remove Tarver and Vega from office and from the organization. And they would certainly share an interest in whether the organization's funds had been misappropriated. Absent a specific allegation identifying individuals outside of the organization that received the December 27 e-mail, we find that the trial court did not err in concluding that the shared-interest qualified privilege applies as a matter of law.

Tarver and Vega further contend that the shared-interest qualified privilege does not apply to the December 27 e-mail because defendants did not establish that the meeting agenda was sent in good faith. But there is a presumption of good faith, *Nuyen* 372 Mich at 660, and the burden lies with Tarver and Vega to overcome that presumption by showing actual malice, *Ireland*, 230 Mich App at 615. We find that the trial court did not err in concluding that the allegations in Tarver and Vega's complaint are insufficient to overcome this presumption. First, the December 29 e-mail from Waligorski and Holloway was sent *after* the e-mail agenda was published and thus does not establish that defendants knew that the allegations were false when the e-mail agenda was published on December 27, 2020. The complaint further alleges that "[d]uring the months of December and January Defendant Dawn Crandall admitted to the police that she did not believe [Tarver and Vega] embezzled money by her statement provided to the police." But the complaint does not provide a date that Crandall made her statement, allege that Crandall made the statement *before* the agenda was published, or allege that Crandall expressed her opinion to the other defendants. And Crandall's own subjective beliefs cannot serve as evidence that the other defendants had actual knowledge that the allegations were false. These allegations are insufficient to rebut the presumption of good faith.

The complaint also alleges that "[d]efendant Robyn Peake as President published several other emails to county presidents of Michigan and members of RWFM. These emails were emails

between Defendant, Peake, and Dr. Linda Lee Tarver, and were emailed prior to the December 29, 2020, special meeting."[3] Because the complaint fails to "identif[y] the exact language that [is] allege[d] to be defamatory" in any of these other e-mails, these allegations are insufficient to support a defamation claim. *Thomas M Cooley Law Sch*, 300 Mich App at 262. And because there is no allegation that these "other e-mails" were sent to persons outside of the organization, the trial court did not err in concluding that the shared-interest qualified privilege applies as a matter of law.

In addition, the complaint implies that false remarks and defamatory statements were made at the December 29 meeting and in the month leading up to the meeting. But the complaint fails to specifically identify who made the statements, to whom the statements were made, or the allegedly defamatory language that was used. These allegations are insufficient to support a defamation claim. *Id*.[4]

We conclude that the trial court did not err by holding that Tarver and Vega failed to allege sufficient facts to survive summary disposition under MCR 2.116(C)(8) for their defamation claim. But "[i]f a court grants summary disposition pursuant to MCR 2.116(C)(8) . . . the court must give the parties an opportunity to amend their pleadings pursuant to MCR 2.118, unless the amendment would be futile." *Weymers v Khera*, 454 Mich 639, 658; 563 NW2d 647, 657 (1997), citing MCR 2.116(I)(5). "Leave [to amend] shall be freely given when justice so requires." MCR 2.118(A)(2). See also *Michigan Head & Spine Inst, PC v Michigan Assigned Claims Plan*, 331 Mich App 262, 277; 951 NW2d 731, 741 (2019) (it is an abuse of discretion to deny leave to amend where amendment would not be futile and is in the interest of justice). Because the defamation claim requires specific pleading, amendment would have been in the interest of justice. Tarver and Vega should be provided an opportunity to amend their complaint to identify all of the statements that they claim are defamatory and include allegations to overcome the shared-interest qualified privilege.

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Tarver and Vega next argue that the trial court erred by dismissing their claims for IIED. We disagree.

"To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v Allstate Ins Co*, 262 Mich App 571, 577; 686 NW2d 273 (2004) (quotation marks and citation omitted). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Lewis v LeGrow*, 258 Mich App 175, 196; 670

---

[3] This allegation is actually contained in the IIED count of the complaint.

[4] We note that the complaint also alleges that there were no statements made at the December 29 meeting about the misappropriation of funds, and there was "no discussion prior to the vote to remove" Tarver and Vega.

NW2d 675 (2003) (quotation marks and citation omitted). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v Mills*, 212 Mich App 73, 91; 536 NW2d 824 (1995). The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 603; 374 NW2d 905 (1985) (quotation marks and citation omitted).

The complaint alleges that defendants' conduct was "intentional and malicious." Tarver and Vega rely on Peake's decision to mail them food items in the shape of feces in support of this claim. Defendants assert that Peake sent the same food item to all of the RWFM executive committee members as a holiday gift, and other members had stated that the food tasted good. The allegations in the complaint appear to support this assertion. Regardless, even if the food item was sent to Tarver and Vega as a practical joke or if members of the executive committee "snickered," at the gesture, this conduct does not establish a claim for IIED. The mailing of edible food, even in the shape of feces, does not rise to the level of outrageous conduct so extreme in degree as to go beyond all possible bounds of decency, which is needed to support a claim for IIED.

Tarver and Vega also allege that Peake's allegedly defamatory statements to the police support their IIED claim. But these statements were absolutely privileged. *Eddington*, 311 Mich App at 202. And the allegations do not rise to the level of conduct necessary to support a claim for IIED.

The complaint further alleges that defendants failed to follow Roberts Rules of Order at the December 29 meeting, defendants held an earlier meeting to discuss the allegations outside the presence of Tarver and Vega, and that defendants colluded to have Tarver and Vega removed because one of the defendants was jealous of Dr. Tarver's leadership roles. Even accepting these allegations as true, they do not involve sufficiently extreme or outrageous conduct to support a claim for IIED as a matter of law. Acting professionally inappropriate, being petty or jealous, holding a secret meeting, or shutting down discussion does not rise to the level of actions so "atrocious" or "utterly intolerable in a civilized community." Rather, they are far closer to "insults, indignities, threats, annoyances, [or] petty oppressions," which do not support a claim for IIED. *Doe*, 212 Mich App at 91. Accordingly, the trial court did not err by dismissing the IIED claim.

C. NONPROFIT CORPORATION ACT

Finally, Tarver and Vega argue that the trial court erred when it dismissed their claim that defendants violated the RWFM bylaws or, as they now argue, the NCA. We disagree.

MCL 450.2489 provides, in pertinent part:

(1) A director of a corporation that is organized on a directorship basis, a shareholder of a corporation that is organized on a stock basis, or a member of a corporation that is organized on a membership basis may bring an action in the circuit court of the county in which the principal place of business or registered office of the corporation is located to establish that the acts of the directors, shareholders, members, or others in control of the corporation are *illegal,*

*fraudulent, or willfully unfair and oppressive* to the corporation or to the director, member, or shareholder.

$$* \quad * \quad *$$

(3) As used in this section, "willfully unfair and oppressive conduct" with respect to a member or shareholder means a continuing course of conduct or a significant action or series of actions that substantially interferes with the rights or interests of a member or shareholder as a member or shareholder. *The term does not include conduct or actions that are permitted by* an agreement, the articles of incorporation, *the bylaws*, or a consistently applied written corporate policy or procedure. [Emphasis added.]

The complaint recites three sections of RWFM's bylaws and generally alleges that Tarver and Vega should not have been removed from their positions, there was no cause for removal, defendants failed to follow Robert's Rules of Order,[5] and they were denied due process. Tarver and Vega have not alleged any facts to support a violation of the bylaws, nor have they established that any alleged violation amounted to "a continuing course of conduct or a significant action or series of actions that substantially" interfered with Tarver and Vega's member rights. Accordingly, the trial court did not err when it dismissed count III of the complaint.

## IV. CONCLUSION

We affirm the trial court's dismissal of Tarver and Vega's IIED and NCA claims. But we reverse the trial court's dismissal of their claims for defamation. Tarver and Vega are entitled to an opportunity to amend their defamation claim as they requested. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Thomas C. Cameron
/s/ Anica Letica

---

[5] None of the sections cited from RWFM's bylaws refer to Robert's Rules of Order.